UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA

| | |
|---|---|
| DONALD YORK EVANS and JOHN WITHEROW, | 3:05-CV-0327-ECR-RAM |
| Plaintiffs, | |
| vs. | **ORDER** |
| LENARD VARE, ROSEMARY SEALS, KELLY BALENGER, and DOES 1-X, | |
| Defendants. | |

**I. Procedural Background**

On June 2, 2005, Plaintiffs Donald York Evans and John Witherow ("Plaintiffs") filed a Complaint (#2) alleging violations of their First and Fourteenth Amendment rights by Defendant Prison Officials Lenard Vare, Rosemary Seals, and Kelly Balenger ("Defendants"). On June 15, 2005, Plaintiffs filed a First Amended Complaint (#8) and a First Amended Motion for Preliminary Injunction (#9). Defendants opposed (#14) on July 18, 2005, and Plaintiffs replied (#16) to the opposition on August 10, 2005. An

evidentiary hearing was held on October 27, 2005, and we now rule on the motion (#9).

For the reasons stated below, Plaintiffs' motion will be granted on the basis set forth in this order.

**II. Factual Background**

Plaintiff Witherow is incarcerated in the State of Nevada. Plaintiff Evans is Witherow's attorney and friend.  Witherow has engaged in compensated paralegal work for Evans and other attorneys in the past, but claims he has not done so since 1997.  The two plaintiffs have a long relationship of correspondence regarding civil rights issues pertaining to Witherow's own case and to greater prisoner civil rights issues in general.

In 1999, Evans wrote a letter to Witherow stating he wanted to employ him for some paralegal work. (Def. Opp. Ex. J.)  Witherow applied for permission to operate a business pursuant to a newly adopted statute in Nevada, N.R.S. 209.4615.  The warden at that time, who is not a party to this lawsuit, denied the request without explanation. (Def. Opp. Ex. L.)  The two plaintiffs then continued their correspondence regarding civil rights.

At the hearing, evidence was presented that from 2001 until 2004, Evans deposited $413 into Witherow's account.  In April of 2004, Evans attempted to deposit $100 into Witherow's prison account.  (Def. Opp. Ex. O & P.)  Defendants believed the money was compensation for business activities, and prevented its deposit in Witherows' account.  Witherow claims that the money sent to him

2

from Evans is similar to that sent from other friends and family, and is not compensation for business activities. (Def. Opp. Ex. S.)

In May of 2004, Defendants began censoring various public record documents sent by Evans to Witherow. (Pl. Mot. Ex. B.) On November 23, 2004, Defendant Vare sent a letter to Witherow stating he would be prohibiting future correspondence between Witherow and Evans "involving legal work and cases, other than [Witherow's] own personal legal matters." The stated reasons for his decision were:

1. [Witherow has] admitted . . . that Mr. Evans and [he] have engaged in a business enterprise in the past.

2. [Witherow was] denied permission to engage in a business relationship with Mr. Evans in 1999 by then director, Bob Bayer.

3. [Witherow is] presently being sent documents related to civil rights cases as well as other legal documents for [his] review and opinion by Mr. Evans.

4. Mr. Evans, by [Witherow's] own admission, sends money to [Witherow's] prison account.

(Def. Opp. Ex. T. (formatting altered).)

According to prison policy, all mail stamped "privileged correspondence" is opened by the law librarian and scanned for contraband, but not read, in the presence of the inmate recipient.[1]
Pursuant to the policy delineated by Vare in the above letter, documents involving legal work and cases other than Witherow's own

---

[1] The method of scanning testified to at the hearing consists of looking for drugs and physical contraband under the staples and in the pages, and looking at the title names of documents. It is not clear to what extent the scanning process picks out names throughout the documents, and to what extent such a process would constitute reading, as opposed to scanning. We will assume for purposes of this order that the methods used by Defendants follow their own guidelines and established jurisprudence and do not involve reading. See Burt, 752 F. Supp. at 348; (Admin. Reg. 722.06.1.4.2, Def. Opp. Ex. AA.)

3

1 personal legal matters are treated by the law librarian as
2 contraband.  Since at least November of 2004, Defendants have
3 repeatedly denied Witherow access to correspondence from Evans when
4 that correspondence contained court orders with the names of
5 parties other than Witherow's.
6     Plaintiffs now move for a preliminary injunction "enjoining,
7 restraining and prohibiting Defendants . . . from restricting,
8 prohibiting, or refusing to deliver Plaintiff Evans' communications
9 to and from [Plaintiff] Witherow regarding various civil right[s]
10 issues, court actions, legal work in progress, or any criminal or
11 civil cases."  (Pl. Mot. at 1.)

**III.  Discussion**

A party seeking a preliminary injunction must meet one of two tests in the Ninth Circuit.  Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1319 (9th Cir. 1994).  The traditional test requires a plaintiff to show that:

    1.   [he] will suffer irreparable injury if injunctive
         relief is not granted;
    2.   [he] will probably prevail on the merits;
    3.   in balancing the equities, the [defendant] will not
         be harmed more than the [plaintiff] is helped by
         the injunction; and
    4.   granting the injunction is in the public interest.

Id. (formatting altered).

In the alternative, a court may issue a preliminary injunction if the plaintiff shows either:

    1.   "a combination of probable success on the merits
         and the possibility of irreparable injury;" or
    2.   "that serious questions are raised, and the balance
         of hardships tips sharply in his favor."

4

1  Id. (formatting altered).

2  Although phrased as such, the alternative test is less an either/or formulation as it is a type of sliding scale. Its two prongs represent "'extremes of a single continuum,' rather than two separate tests." Sun Mircrosystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999) (quoting Benda v. Grand Lodge of Int'l Ass'n of Machinist & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978)). That is, the more the balance of hardships tips in favor of the plaintiff, the less probability of success must be demonstrated. Walczak v. EPL Prolong, Inc., 198 F.3d 725, 731 (9th Cir. 1999).

Whichever test is applied, a preliminary injunction should only be granted if the movant does not have an adequate remedy at law. Stanley, 13 F.3d at 1320 (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07, n.8 (1959)). A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)(quoting 11A Charles Alan Wright & Arthur Miller, Federal Practice & Procedure § 2948 (2d ed. 1995)). "The cases best suited to preliminary relief are those in which the important facts are undisputed, and the parties simply disagree about what the legal consequences are of those facts." Remlinger v. State of Nev., 896 F.Supp. 1012, 1015 (D. Nev. 1995).

### A. Irreparable Injury

Plaintiffs allege irreparable injury to their First Amendment rights resulting from Defendants' blanket prohibition of all legal mail perceived by Defendants as not directly pertaining to Witherow's case. The First Amendment rights of both the writer and the intended reader are impinged when correspondence is censored by prison officials. Procunier v. Martinez, 416 U.S. 396, 408-409, (1974), overruled on other grounds in Thornburgh v. Abbot, 490 U.S. 401 (1989). Furthermore, the federal courts have "heightened concern" for protecting "legal mail," such as that between a prisoner and his attorney, and the prisoner's attendant right of access to the courts. Sallier v. Brooks, 343 F.3d 868, 874 (6th Cir. 2003) (citing, e.g., Davis v. Goord, 320 F.3d 346, 351 (2nd Cir. 2003)); Taylor v. Sterrett, 532 F.2d 462, 470-72 (5th Cir. 1976). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (also finding "threatened" First Amendment rights to constitute irreparable injury). Thus, because Plaintiffs have alleged injury to their First Amendment and other constitutional rights, Plaintiffs have demonstrated the irreparable injury prong of the alternative preliminary injunction test.

### B. Probable Success on the Merits

In order to justify the "extraordinary remedy" of a preliminary injunction, Plaintiffs must also demonstrate their probable success on the merits of their claims. The Ninth Circuit

6

has held that prison policies may infringe Plaintiffs' First Amendment and Due Process rights to receive mail in general, if those policies are "reasonably related to legitimate penological interests." <u>Prison Legal News v. Lehman</u>, 397 F.3d 692, 699 (quoting <u>Turner v. Safely</u>, 482 U.S. 78, 89 (1987)). The Supreme Court, established the following four-factor "<u>Turner</u>" inquiry to determine whether a policy is reasonably related to a legitimate penological interest:

    (1) whether the regulation is rationally related to a legitimate and neutral governmental objective,

    (2) whether there are alternative avenues that remain open to the inmates to exercise the right,

    (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and

    (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

<u>Id.</u> (formatting altered).

However, the Ninth Circuit has not addressed what impact, if any, that the heightened concern accorded to the protection of legal mail should have on this test. <u>See, e.g.</u>, <u>Taylor</u>, 532 F.2d at 470 ("the right of access to the courts is afforded special protection"). Thus, in order to address this problem, we look to the reasoning of other circuits and district courts.

In 1971, finding that it would not "unnecessarily hamper prison administration to forbid prison authorities to delete material from, withhold, or refuse to mail a communication between an inmate and his attorney . . . unless it can be demonstrated that

7

a prisoner has clearly abused his rights of access," the Second Circuit reasoned

> It would be inappropriate on constitutional grounds, ironic, and irrational to permit drastic curtailment of constitutional rights in the name of punishment and rehabilitation, while denying prisoners a full opportunity to pursue their appeals and postconviction remedies. The generous scope of discretion accorded prison authorities also heightens the importance of permitting free and uninhibited access by prisoners to both administrative and judicial forums for the purpose of seeking redress of grievances against state officers. The importance of these rights of access suggests the need for guidelines both generous and specific enough to afford protection against the reality or the chilling threat of administrative infringement.

Sostre v. McGinnis. 442 F.2d 178, 200, called into question on other grounds by Procunier, 416 U.S. 396.  A 1972 Second Circuit decision noted the distinction Sostre made between legal and nonlegal mail in holding that in order to justify official interference with legal mail, the prison must show "a compelling state interest centering about prison security, or a clear and present danger of a breach of prison security, or some substantial interference with orderly institutional administration." Goodwin v. Oswald, 462 F.2d 1237, 1244 (citation and alteration omitted). After examining the decisions of many courts, including the Second Circuit and the Supreme Court, the Fifth Circuit held in 1976 that "[b]efore procedures that impede a prisoner's access to the courts may be constitutionally validated, it must be clear that the state's substantial interests cannot be protected by less restrictive means."  Taylor, 532 F.2d at 472.

What is unclear is the extent to which the Supreme Court's later adoption of the Turner reasonableness test for incoming non-

8

legal mail trumps these early Second Circuit holdings establishing a more heightened type of scrutiny for legal mail. See Thornburgh v. Abbot, 490 U.S. 401, 411-414 (1989) (rejecting a "least restrictive means" test for incoming prisoner personal mail because of the potential security threats presented by incoming mail, but not addressing the particular constitutional implications of interference with legal mail). Further complicating the analysis, the only post-Thornburgh circuit decisions to address legal mail do not examine issues of outright censorship, as occurs in this case, but rather address the prisoner's well-established right to have her legal mail opened and examined for contraband, but not read, in her presence. Davis v. Goord, 320 F.3d 346, 351 (2nd Cir. 2003) (citing to Wolff v. McDonnell, 418 U.S. 539 (1974), for basis of above-stated right); Sallier v. Brooks, 343 F.3d 868, 874 (6th Cir. 2003) (same). Nevertheless, the decisions do provide some guidance for addressing legal mail.

In Davis, the Second Circuit relied on pre-Thornburgh decisions to hold that "[r]estrictions on prisoners' [legal] mail are justified only if they 'further one or more of the substantial governmental interests of security, order, and rehabilitation, and must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" 320 F.3d at 351 (quoting Washington v. James, 782 F.2d 1134, 1139 (2nd Cir. 1986) (alterations omitted)). The Davis court further held that a plaintiff states a "constitutional claim for violating his right to send and receive legal mail" when he establishes "an ongoing practice by prison officials of interfering with his [legal] mail

9

[]or any harm suffered by him from the tampering." Id. at 352. Thus, the Second Circuit employs heightened scrutiny for legal mail.

The Sixth Circuit was slightly more direct in tackling the problem of reconciling the special status of legal mail with the post-Thornburgh reasonableness model. In Sallier, the Sixth Circuit first noted that prisoners' general First Amendment right to receive mail may be infringed by "restrictions that are reasonably related to security or other legitimate penological objectives," as long as it is done "pursuant to a uniform and evenly applied policy with an eye to maintaining prison security." Sallier, 343 F.3d at 873-74 (citation omitted). The Sallier Court then emphasized:

> when the incoming mail is "legal mail," we have heightened concern with allowing prison officials unfettered discretion to open and read an inmate's mail because a prison's security needs do not automatically trump a prisoner's First Amendment right to receive mail, especially correspondence that impacts upon or has import for the prisoner's legal rights, the attorney-client privilege, or the right of access to the courts.

Id. (citing, e.g., Davis, 320 F.3d at 351 ). Therefore, Sallier held, when mail from a legal source involves "protecting a prisoner's access to the courts and other governmental entities to redress grievances or with protecting an inmate's relationship with an attorney," the court "must balance the interest of prison security against the possibility of tampering that could unjustifiably chill the prisoner's right of access to the courts or impair the right to be represented by counsel." Id. at 874.

10

Although the Sixth Circuit's approach is somewhat softer than the Second Circuit's, both Circuits adopt tests involving a more piercing level of scrutiny than reasonableness when considering prison officials' actions that tamper with prisoners' legal mail. The fact that neither circuit directly addresses <u>Thornburgh's</u> repudiation of heightened scrutiny for nonlegal mail may be reconciled by the fact that no Supreme Court decision exists that directly addresses the proper level of scrutiny for legal mail.[2] Furthermore, while the Ninth Circuit has not directly addressed this issue, at least one post-<u>Thornburgh</u> Central District of California court adopted a least restrictive means test for interference with legal mail. <u>Burt v. Carlson</u>, 752 F. Supp. 346 (C.D. Cal. 1990).[3] We agree with these courts that the added constitutional concern of maintaining prisoners' access to the courts requires heightened scrutiny of prison officials' tampering

---

[2] While one Supreme Court decision to address a legal mail question did find that a requirement that legal mail may be opened in the presence of a prisoner did not constitute censorship nor did it chill attorney-client communications as the mail would not actually be read, it did not set forth any particular level of scrutiny for legal mail restrictions. <u>Wolff . McDonnell</u>, 418 U.S. 539 (1974). A 1941 decision invalidating regulations requiring all legal documents to be submitted to and reviewed by prison officials did so, succinctly, on the basis that the regulations impaired prisoners' specific right to Habeas Corpus, but did not address access to the courts in general. <u>Ex Parte Hull</u>, 312 U.S. 546, 642 (1941).

[3] We note that <u>Burt's</u> citation of <u>Procunier</u> for the proposition that the least restrictive means test applies to infringement of apparently any constitutional right appears to not take into consideration the recent <u>Thornburgh</u> decision and, therefore, calls <u>Burt's</u> reasoning into question. However, because <u>Burt</u> applies the test to interference with legal mail, and because <u>Thornburgh</u> does not address legal mail, as discussed above, <u>Burt</u> does provide at least some indication of how a more thorough examination of the issue in the Ninth Circuit may unfold.

11

with prisoners' legal mail.  We therefore hold that restrictions on prisoners' legal mail are justified only if they further one or more of the substantial governmental interests of security, order, and rehabilitation, and must be no greater than is necessary for the protection of the particular governmental interest involved.

Because the parties have presented their arguments pursuant to a reasonableness analysis, we will identify their arguments as such, and adapt them to the heightened scrutiny analysis established above.  Defendants have proposed the following as legitimate penological interests related to their restrictions: keeping confidential information from Witherow that could pose a security threat and keeping Witherow from practicing a business without approval from the prison director.  Defendants cite administrative regulations and statutes as evidence of the legitimacy of these interests.

**1. Confidentiality/Safety concerns**

Defendants assert that Witherow's receipt of information which may contain personal information about other inmates and citizens in general poses a security threat in that the information may be used by Witherow or accessed by other inmates to cause harm.  We agree that some forms of personal information, such as an inmate's status as a sex offender, could indeed present a security risk in certain circumstances.  As discussed above, maintaining security is one of the substantial government interests we have identified that may justify interference with legal mail.  Our next step, then, is to assess whether the restrictions placed on Plaintiffs'

12

correspondence further this interest in a manner that is no more restrictive than is necessary for that furtherance.

Defendants' restrictions impose a complete ban on all correspondence between Witherow and Evans that appears to the law librarian to address cases other than Witherow's.  This ban has been applied even to cases where the names of parties in an order have been blacked out.  We find that the ban is more restrictive of Plaintiffs' constitutional rights than is necessary to maintain prison security.

Witherow and Evans maintain that their correspondence involves the discussion of legal issues pertinent to Witherow's own criminal and civil rights claims, as well as prisoner civil rights issues in general.  We find that as long as the correspondence from Evans to Witherow is genuinely related to Witherow's own criminal and civil rights claims, then such correspondence falls within the definition of legal mail put forth and protected in <u>Sallier</u>, and Evans may correctly identify it as legal mail. 343 F.3d at 877.  The fact that the correspondence consists of legal orders pertaining to persons other than Witherow does not mean that those orders are irrelevant to Witherow's claims, or that the prison officials are empowered to decide their relevance.  <u>See</u> <u>Sostre</u>, 442 F.2d at 201.  Rather, thorough analysis of legal orders and opinions on relevant issues is the cornerstone of effective litigation.  However, any correspondence between the parties that does not involve protecting Witherow's access to the courts and, thus, would be better classified as personal correspondence between the two as friends,

13

should not be afforded the same protection as legal mail.[4] It is up to the sender, in this case, Mr. Evans, to properly identify the correspondence as legal mail. See Wolff, 418 U.S. at 577 (finding it appropriate to require attorney to identify legal mail as such in order to be protected).

Any actions taken by prison officials in regard to correspondence between Witherow and Evans that has been identified as legal mail must constitute the least restrictive means of furthering prison security. We note that except in the possible case of published decisions, knowing the identities of parties discussed in orders and decisions is not necessary for studying and effectively utilizing those orders and decisions. Therefore, we find that a policy whereby party names other than Witherow's or persons directly involved in Witherow's litigation, except in the case of published opinions or reference thereto, must be redacted in legal mail from Evans to Witherow, would properly balance the security interests of the prison with the potential for chilling Witherow's right of access to the courts and representation by counsel. See Sallier, 343 F.3d at 874. We further note that such a policy could be executed pursuant to Defendants' current "scan, not read," policy for legal mail, thereby preventing the implication of the constitutional concerns inherent in prison

---

[4] We note that in the vast majority of cases, all mail between an attorney and a prisoner would be properly identified as legal mail. It is the unique relationship present in the case at bar, wherein the parties have both a personal friendship and a legal relationship, that warrants our recognizing a distinction between legal and personal mail between the two.

14

officials' reading of prisoner mail.  <u>See</u> <u>Burt</u>, 752 F. Supp. at 348.

**2. Prohibited Business Relationship**

Defendants also cite their interest in preventing Witherow from conducting a paralegal business as a reason for denying his receipt from Evans of documents involving legal work and civil rights cases.  Witherow had applied for permission to conduct a business pursuant N.R.S. 209.4615, which the former warden disapproved as per his discretion in that statute.  Witherow claims that while he has engaged in compensated paralegal work for Evans and other attorneys in the past, he has not done so since 1997.  Witherow claims further that his current correspondence with Evans is related to his own legal case and civil rights issues in general.

Defendants have presented some evidence of violence related to Witherow's legal work for another inmate; and the scope of N.R.S. 209.4615, which regulates inmate businesses, can be said to further the maintenance of prison order.  Thus, keeping Witherow from conducting a paralegal business could be considered to be a substantial government interest when pursued in order to prevent further violence and maintain order.  However, in order to prove a security threat exists that warrants interfering with Witherow's access to legal mail, Defendants would have to prove that Plaintiffs are currently engaging in a business relationship, and we find that their evidence falls short of so proving.

In addition, as with the case of preventing the dissemination of confidential information about inmates, we find that preventing all correspondence regarding cases other than Witherow's is more restrictive than necessary to protect the interests of prison security and order.  For example, if, as discussed above, the names of all parties, other than those found in published decisions, are redacted from the correspondence, Plaintiff Witherow would be unable to effectively administer his suspected paralegal business. Furthermore, in balancing the competing interests presented by the factual record, we find that the potential risks to security and order presented by Witherow's suspected, but unproven, paralegal business are outweighed by the substantial and actual risks of chilling his access to the courts and counsel by preventing all consideration of court orders and opinions with names other than his own.

Therefore, Plaintiffs have demonstrated both irreparable injury to their constitutional rights and probable success on the merits of their claims.

**IT IS HEREBY ORDERED** that Plaintiff's First Amended Motion for Preliminary Injunction (#9)is **GRANTED**.  A preliminary injunction order shall be issued forthwith.

This 18th day of November, 2005.

*Edward C. Reed*
_____
UNITED STATES DISTRICT JUDGE